**IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF PENNSYLVANIA**

|  |  |  |
|---|---|---|
| **JOANN SEBASTIANI,** | ) | |
| **Plaintiff;** | ) | **No.**  2:21-cv-1114 |
| **v.** | ) | |
| | ) | |
| **WESTMORELAND COUNTY, SEAN** | ) | **JURY TRIAL DEMANDED** |
| **KERTES, GINA CERILLI** | ) | |
| **THRASHER, and DOUGLAS CHEW,** | ) | |
| **Defendants.** | ) | |

**COMPLAINT**

AND NOW, comes the Plaintiff, JOANN SEBASTIANI, by and through her attorneys,

The Lindsay Law Firm, PC, Alexander H. Lindsay, Jr., and Max B. Roesch, Esquire, and files the

following complaint against WESTMORELAND COUNTY, and in support thereof avers the

following:

**PARTIES**

1.     Plaintiff JoAnn Sebastiani ("Plaintiff") is a 63-year-old woman residing in

Westmoreland County, Pennsylvania.

2.     Defendant, Westmoreland County ("County") is a county and political

subdivision within the Commonwealth of Pennsylvania maintaining an office at 102 Courthouse

Square Main Street, Greensburg, PA 15601.

3.     Defendant Gina Cerilli Thrasher ("Thrasher") is an adult individual who is a

County Commissioner of Westmoreland County. She is a state actor with hiring and firing

authority over employees in Westmoreland County.

4.     Defendant Douglas Chew ("Chew") is an adult individual who is a County

Commissioner of Westmoreland County. He is a state actor with hiring and firing authority over

employees in Westmoreland County.

5.      Defendant Sean Kertes ("Kertes") is an adult individual who is a County

Commissioner of Westmoreland County. He is a state actor with hiring and firing authority over

employees in Westmoreland County.

## JURISDICTION

6.      This Court has jurisdiction over the present action pursuant to 42 U.S.C. § 1983

and 29 U.S.C. § 2601 et seq. This Court has jurisdiction over Plaintiff's pendant state law claims

pursuant to 28 U.S.C. § 1367.

7.      Venue is proper in this district because transactions and occurrences upon which

the allegations in the Complaint are based occurred in this district.

## FACTS

8.      Plaintiff first became employed by Defendant in 2015 in the Adult Probation

Office.

9.      Plaintiff was promoted to Deputy Director of the Tax Office in July 2015.

10.     On August 7, 2020, the Commissioners of Defendant Westmoreland County

approached Plaintiff about taking the recently vacated Director of Elections position, or the

Deputy Director position.

11.     The prior Director of Elections, Beth Lechman, had abruptly resigned on July 31,

2020.

12.     Plaintiff demurred, citing her lack of experience in administering elections.

13.     The Commissioners assured Plaintiff that she was a "good fit" and her lack of

experience did not matter.

14.     Indeed, Commissioner Kertes was quoted in a newspaper article published August

17, 2020 supporting Plaintiff's elevation to the Director position and praising her

accomplishments in the Tax Office.

15.     Plaintiff eventually relented to the pressure and began as Elections Director on August 17, 2020.

16.     At the request of the Commissioners, Plaintiff drafted a letter of interest and provided it with an updated resume.

17.     On or about August 12, 2020, shortly before Plaintiff was elevated to Elections Director, Plaintiff received a call from Commissioner Kertes secretary, Francine Gibbon.

18.     Gibbon informed Plaintiff that it was imperative that Plaintiff change her party affiliation from the Democratic Party to the Republican Party.

19.     Plaintiff asked why, and Gibbon explained "They want more Republican Directors, and Commissioner Kertes is getting heat from county officials because you are a Democrat."

20.     The secretary then told Plaintiff that, if anyone asked why she switched parties, to say that it was because she did not like that the Democratic Vice Presidential candidate was African American.

21.     Plaintiff informed the secretary that she would never say such a thing.

22.     Because of the pressure from Commissioner Kertes, Plaintiff reluctantly changed her party affiliation to republican.

23.     Plaintiff was not offered any training to help adjust to her new position, nor were any training manuals available to her.

24.     Instead, Plaintiff reached out to personnel in the Commonwealth's Department of State and other Election Directors in other Commonwealth counties to get her bearings.

25.     The timing of Plaintiff's elevation to Director was particularly fraught because of the Commonwealth wide shut downs due to the COVID-19 pandemic.

26.     Additionally, there was rampant turnover in the management of the Elections Division surrounding Plaintiff's elevation – the prior Director, Beth Lechman, had resigned

abruptly shortly before, and the Deputy Director, Scott Sistek, was abruptly terminated shortly

after on October 1, 2020, a mere month before the November election.

27.     Prior to accepting the Director position, Plaintiff was not advised that the Election

Office had severe, long standing personnel issues, specifically related to a work environment

characterized by rampant bullying and high turnover.

28.     Furthermore, by August 2020 it was clear that the November 2020 presidential

election would be particularly controversial.

29.     In addition to external factors and executive turnover, Plaintiff faced resistance

from some members of the existing staff.

30.     Specifically, Plaintiff's subordinates Lori Horvat and Sherri Link worked actively

to sabotage Plaintiff's efforts by purposefully providing incorrect information to the public,

handing out incorrect petitions, hiding important paperwork from Plaintiff, and providing

Plaintiff with false and misleading information.

31.     Horvat and Link also disseminated incorrect information to voters, and would

encourage those voters to complain to the Commissioners about Plaintiff when they became

frustrated.

32.     Horvat and Link also encouraged other staff members to engage in similar

sabotage.

33.     Periodically, and Link and Warehouse Manager Jackie McGrail would remind

Plaintiff that they had personal relationships with Commissioner Chew, and would show Plaintiff

text messages from Commissioner Chew in order to intimidate her.

34.     Plaintiff was also subjected to near constant harassment from subordinates and

Defendant Commissioners, and the County Solicitor, Melissa Guiddy.

35.     Plaintiff suffered a concussion and traumatic brain injury in a work related injury

on November 14, 2018.

36.     Plaintiff suffers from persistent post-concussion symptoms, including posttraumatic tinnitus, intermittent aphasia, headaches, anxiety, insomnia, confusion, and dizziness.

37.     Because of Plaintiff's post-concussion symptoms, she was routinely subjected to disparaging, abusive comments, and ridicule.

38.     Senior county officials often ridiculed Plaintiff for speaking too loudly, which is caused by her concussion symptoms.

39.     On one particularly embarrassing occasion in November 2020, Defendant Thrasher and Solicitor Guiddy reprimanded Plaintiff for speaking too loudly while reading an email from the Department of State to them during a Provisional Board Meeting.

40.     Plaintiff's intermittent aphasia requires at times that she search for the correct word to say – co-workers and county officials would then denigrate her for staring.

41.     On one occasion, Plaintiff's aphasia caused her to misspeak, using the word "prothonotary" instead of "provisional" – Defendant Kertes responded with "what are you talking about…you make no sense."

42.     On another occasion in November 2020, senior county officials mocked and degraded Sebastiani on a group text message chain, not realizing that she was part of the text message chain.

43.     On another occasion in early June 2021, Defendant Chew loudly berated Plaintiff, making frequent use of the "f-word", in front of a group of approximately 10 county employees, criticizing her for a decision that she implemented following the approval of the other two commissioners.

44.     Specifically, Commissioners Kertes and Cerilli Thrasher voted to only count write in votes with the correct spelling of the candidates name, and specifically instructed Plaintiff to do so.

45.     Furthermore, Kertes, Cerilli Thrasher, and Solicitor Guiddy instructed an outside vendor, Election System and Software LLC (ES&S), to run queries to eliminate tabulation of write in votes for races that were not in contention.

46.     When Plaintiff asked Joe Passarella, a representative of ES&S who instructed them to run the queries he responded that Melissa Guiddy had.

47.     ES&S also mistakenly excluded several school district races in the queries.

48.     As a result, fourteen races were not included in the results, which led to negative publicity and Court complaints by aggrieved candidates.

49.     Plaintiff was scapegoated by Commissioner's Kertes, Cerilli Thrasher, and Chew for implementing the policy that they had concocted.

50.     Defendant Chew went on to state "Your work is a bag of shit" and threw a stack of papers across the table at Plaintiff.

51.     The following day, Greg McClosky told Plaintiff "If I was treated the way you were yesterday, I would have removed my badge and keys, laid them on the table, and walked out."

52.     Furthermore, senior staff frequently held meetings to make election decisions during the November election season and May election season while purposefully excluding Sebastiani, complaining to each other that she was "weird" and they did not like how she "stared."

53.     At one such meeting shortly before the November presidential election, the Commissioners and Solicitor Guiddy authored a letter, filled with blatantly inaccurate information, to be included in the materials for precinct Judges of Election, signing it "Elections", and had it delivered to the warehouse for distribution.

54.     Fortunately, a warehouse employee noticed the letter and asked Plaintiff about it before it was distributed, and Plaintiff was able to avoid distribution of the inaccurate letter.

55.     At one meeting in November 2020, Solicitor Guiddy loudly berated Plaintiff in front of 15 other county officials. Joe Passarella, an outside vendor who participated in the meeting, told Plaintiff after the meeting "I was so embarrassed for you that I wished I hadn't been in the meeting. You were treated brutally."

56.     The Commissioners and other senior staff frequently refused to communicate decisions made in the meeting from which Plaintiff had been excluded to Plaintiff.

57.     Despite the internal and external challenges, Plaintiff administered a successful election in November 2020.

58.     Following the November election, the Election Bureau began to suffer from lack of sufficient staff and lack of experienced staff.

59.     Applying lessons learned during the November election, Plaintiff requested that important management positions, such as the Deputy Director position and the Office Manager position, be staffed to ensure smooth operations moving forward.

60.     Plaintiff also requested that important information technology and logistical function be removed from third party contractors and taken over by a new position in the Elections Bureau in order to ensure continuity and create cost savings for the County.

61.     Plaintiff's requests were ignored. In mid-March, 2021, Plaintiff, distraught and anxious about the lack of support, citing her escalating concussion symptoms and stating "this job is ruining my health" Plaintiff sobbingly asked to transfer to her prior position as Deputy Director of the Tax Office, which was still vacant, in a meeting with the Commissioners, Solicitor Melissa Guiddy, and the Human Resources department.

62.     The Commissioners denied Plaintiff's request, explaining that, although they understood Plaintiff was extremely upset, they were "going to address the personnel issued in the Election Office and build the office around [Plaintiff]"

63.     In particular, Human Resources Director Alexis Bevin was well aware of Plaintiff's escalating symptoms, as Plaintiff routinely informed her when she had to leave the office for doctors appointments and concussion evaluations.

64.     In early March 2021, Link, Horvat, Jackie McGrail, the manager of the Elections Bureau's warehouse, and another non-county employee met at the Election Warehouse to devise a strategy to have Plaintiff terminated.

65.     They determined to write and submit a letter to the County accusing Plaintiff of malfeasance and incompetence.

66.     In response to the letter, the County launched an independent investigation, conducted by a law firm into Plaintiff, claiming the investigation was into alleged misconduct by Plaintiff.

67.     On information and belief, the prior Elections Director, Beth Lechman, had been terminated following a similar ploy.

68.     The independent investigation concluded that there had not been any misconduct.

69.     However, on March 26, 2021 Defendant's Human Resources Director Alexis Bevin issued a letter to Plaintiff accusing her of "violating County Policy" based on minor mistakes made by her subordinates, other County departments, and outside contractors.

70.     Visibly upset, Plaintiff told Bevin again that the Election position was ruining her health and making her concussion symptoms worse.

71.     Plaintiff went on to explain that one of doctors was concerned with her escalating symptoms and wanted her to take a leave of absence, and reminded Bevin of her ongoing workers compensation case.

72.     Bevin responded "tell your attorney, the case will continue."

73.     Plaintiff responded by letter, indicating that she disagreed with Bevin's characterizations.

74.     Plaintiff continued her requests that important information technology and logistical function be removed from third party contractors and taken over by a new position in the Elections Bureau, and to hire sufficient staff.

75.     On March 30, 2021, Plaintiff submitted an email to the Commissioners outlining her requests for what was needed to prepare for May election.

76.     In a meeting the next day, Commissioner Kertes told Plaintiff that "there are too many items on the list" and refused to discuss all but one of Plaintiff's concerns.

77.     After a meeting in April 2021, another County Director, Greg McCloskey, approached Plaintiff and told her that he was appalled at how Plaintiff had been treated in the meeting.

78.     McCloskey continued "I have never seen a Director treated this way in all my years at the County, I was so mad I almost walked out."

79.     Several days later in Plaintiff's office, McCloskey related that he had approached Solicitor Guiddy and suggested that she "back off" ridiculing the Plaintiff, and that the Solicitor had responded that the ridicule was justified because the Plaintiff would "stare" while being spoken to and take too long to answer questions.

80.     Plaintiff responded "They need to stop saying negative remarks about my accident at work, and stop belittling, traumatizing, and abusing me."

81.     McCloskey responded "I guess I shouldn't have told you what was said – I don't need to be in the middle of a lawsuit, I have too many skeletons in my closet."

82.     Plaintiff administered the May 2021 Primary election with only minor delays.

83.     The delays were largely attributable to third party contractors and entities.

84.     During the Primary election, the Elections Bureau was dramatically understaffed.

85.     Indeed, early in May 2021, Commissioner Kertes stopped at Plaintiff's office and asked "how's it going?" When Plaintiff responded "I'm hanging by a shoestring." Kertes simply laughed.

86.     Indeed, Plaintiff was handling the job duties and responsibilities not only of the Director position, but also those of the Deputy Director, Office Manager, Information Technology, and Office Coordinator.

87.     On June 8, 2021, the morning after Plaintiff submitted the Final Certification to the Department of State for the Primary election, the County abruptly suspended Plaintiff and issued another letter detailing Plaintiff's supposed failings as Director.

88.     One of the mistakes highlighted in the letter was the omission of a race for Magisterial District Judge from mail-in ballots sent to voters in several Mt. Pleasant Township precincts.

89.     Although plaintiff accepted responsibility for the omission and took steps to correct it, the final ballots had been reviewed and approved by all Commissioners, Chief of Staff members, Solicitor Guiddy, and both Democratic and Republican County Chairmen.

90.     Indeed, after the omission came to light, Commissioner Chew texted Plaintiff directly telling her "don't worry about [the omission], I can't believe I didn't catch that either".

91.     Plaintiff responded by letter, pointing out that many of the errors cited by the County were routine delays.

92.     Plaintiff further pointed out that all of the errors, regardless of their origin, were quickly and efficiently corrected.

93.     Plaintiff's contacts in the Commonwealth's Department of State were shocked by her suspension.

94.     Indeed, Plaintiff's contacts in the Commonwealth's Department of State, Adam Yake, lauded her efforts as Director, her extremely hard work ethic, and pointed to Westmoreland

County as a model county in the Commonwealth with respect to the timeliness and accuracy of its elections under Plaintiff's tenure.

95.     At a breaking point after months of harassment and hard work, Plaintiff also requested FMLA leave on the advice of her physicians, and filed an application to reinstate her Workers Compensation Benefits on June 8, 2021.

96.     On June 15, 2021, the County HR Director Alexis Bevin informed Plaintiff that she would be terminated on June 18, 2021 unless she accepted one of two alternative positions with the County.

97.     Plaintiff was not qualified for either of the offered positions, one of which was also compensated at a much lower rate that either Plaintiff's position as Elections Director or her prior position as Tax Deputy Director.

98.     Despite multiple openings in the Tax Bureau, where Plaintiff had flourished prior to her tenure in Elections, Plaintiff was not offered a position in the Tax Bureau.

99.     While Sebastiani was on leave, Defendant announced that the Election Bureau would be reorganized and overhauled.

100.    In fact, the "reorganization" that Defendant announced simply implemented the personnel and logistical changes that Plaintiff had repeatedly requested.

101.    On June 25, 2021 Defendants terminated Plaintiff's employment effective on June 19, 2021.

102.    A few days after Plaintiff was terminated, several of the vacant positions that Plaintiff had repeated requested be filled were finally posted.

103.    The Office Manager position was filled immediately without being posted.

104.    While Plaintiff was Director, another county employee had expressed interest in the Office Manager position and requested a salary of $47,000, which the Commissioners had rejected.

105.    The county employee that filled the Office Manager position after Plaintiff's termination was hired at a salary of $60,000, more than Plaintiff had been compensated.

106.    Prior to Plaintiff's termination, Greg McClosky, who was subsequently elevated to Interim Director of the Elections Bureau, stated "We are going the increase salaries substantially and everyone in the County will want to work in the Elections Bureau. We will buy them with money and we will own them."

107.    McClosky referred to the increased salaries as "hush money".

108.    In fact, all positions in the Elections Bureau received a substantial increase in pay following an emergency salary board meeting almost immediately after Plaintiff's termination.

## COUNT I

### 42 U.S.C. § 1983 – First Amendment Retaliation – Political Affiliation

109.    The preceding paragraphs are incorporated herein as if set forth at length.

110.    Defendants violated Plaintiff's right to free speech under the First Amendment by demanding that she change her party affiliation in order to occupy the Elections Director Position.

111.    Defendants retaliated against Plaintiff for resisting the violation of her First Amendment rights.

112.    Defendants retaliated against Plaintiff because she refused to adopt Defendants' false proffered explanation for her switching party affiliation – that she had switched because she did not like that the Democratic Vice Presidential Candidate was African American.

113.    At all relevant times, Defendants acted under color of law.

114.    As a result of Defendants' reckless and intentional actions, Plaintiff sustained economic and non-economic damages.

## COUNT II

### 29 U.S.C. § 2601 et seq. – Family Medical Leave Act Discrimination

115.    The preceding paragraphs are incorporated herein as if set forth at length.

116.    Plaintiff applied for Family Medical Leave on June 8, 2021.

117.    Defendants retaliated against Plaintiff for applying for Family Medical Leave by terminating her on June 19, 2021.

118.    Plaintiff suffered financial and emotional harm as a result of Defendant's unlawful discrimination.

## COUNT III

### 42 U.S.C. § 1983 – Deprivation of Liberty Interest

119.    Plaintiff incorporates the preceding paragraphs as if set forth more fully at length herein.

120.    Plaintiff has a liberty interest protected by the Due Process Clause of the Fifth and Fourteenth Amendments of the United States Constitution to be free from false charges made under color of law which involved or implied personal and professional dishonesty, immorality or malfeasance in office, or which adversely reflected on or damaged his career and future in his employment.

121.    Defendant created and disseminated a false and defamatory impression concerning Plaintiff in connection with her employment and termination to the media indicating that Plaintiff had been suspended and terminated because she mishandled the Elections Bureau.

122.    Defendants publicly published statements casting Plaintiff as incompetent and said statements concerning Plaintiff would be reasonably taken by the average person, including her coworkers, peers, and prospective employers, to impute upon Plaintiff a false and defamatory impression.

123.    The publication by Defendants of these substantial and material falsehoods was done knowingly and with deliberate indifference to their lack of veracity, being politically and personally motivated as retaliation against Plaintiff.

124.    Defendant's actions in this regard infringed upon the reputation, honor, and integrity of Plaintiff.

125.    Said conduct by Defendants deprived Plaintiff of his protected liberty interest in her reputation without due process.

126.    Defendants were acting under color of state law at the time they so deprived Plaintiff of his protected liberty interest in her reputation.

127.    As a result of Defendants' conduct, Plaintiff suffered injuries including damage to her good name and reputation.

128.    Plaintiff also suffered injury to her potential future employment as Defendants' as the statements made about Plaintiff are reasonably likely to damage her standing and associations in the community.

**Pendant State Claims**

**COUNT IV**
**Discrimination in Violation of Public Policy – Workers Compensation Discrimination**

129.    Plaintiff incorporates the preceding paragraphs as if set forth more fully at length herein.

130.    Defendants displayed an animus against Plaintiff for her filing a Workers Compensation claim by mocking and critisizing her symptoms that arose from the injury she sustained.

131.    Defendants terminated Plaintiff's employment shortly after she moved to reinstate her Workers Compensation benefits.

WHEREFORE, Plaintiff prays for the following relief: Plaintiff demands punitive and compensatory damages, including but not limited to those for emotional and mental distress, in an amount to be determined, an award of attorney fees and costs, and any other equitable remedy that the Court deems reasonable and just.

## COUNT V

### Intentional Infliction of Emotional Distress

120.    The prior paragraphs are incorporated herein by reference as if set forth fully at length.

121.    Defendants were aware of Plaintiff's heightened sensitivity due to the symptoms arising from her concussion, and engaged in harassment of the Plaintiff with a tortious intent for the purpose of inflicting upon the Plaintiff severe and acute emotional distress.

122.    The aforesaid intentional and wanton acts of Defendants have caused the Plaintiffs severe emotional distress.

123.    Because the Defendants treatment of Plaintiff, she has suffered significant setbacks in the process of recovering from the concussion.

124.    Defendant's conduct herein was extreme and outrageous, and Defendant acted intentionally and recklessly, and with willful misconduct thereby causing severe emotional distress to Plaintiffs.

125.    "Willful misconduct, for the purposes of tort law, has been defined by [the Pennsylvania] Supreme Court to mean conduct whereby the actor desired to bring about the result that followed or at least was aware that it was substantially certain to follow, so that such desire can be implied." *Renk v. Pittsburgh,* 537 Pa. 68, 641 A.2d 289, 293 (1994) (citing *Evans v. Phila. Transp. Co.,* 418 Pa. 567, 212 A.2d 440, 443 (1965)).

126.    Defendant's conduct would cause an average member of the community to arouse his resentment against the Defendants and lead him to exclaim, "Outrageous!"

127.    Plaintiff has suffered physical harm as a result of Defendants actions, including night terrors, stress, and ongoing mental suffering.

WHEREFORE, Plaintiffs demand judgment against the Defendants in an amount in excess of the arbitrations limits, plus costs, punitive damages, and such relief as the Court may deem proper.   A JURY TRIAL IS DEMANDED

Respectfully Submitted,
The Lindsay Law Firm, PC


*Alexander H. Lindsay, Jr.*
Alexander H. Lindsay, Jr., Esq.
Pa. Supreme Court Id. No. 15088

*Max B. Roesch*
Max B. Roesch, Esquire
Pa. Supreme Court Id. No. 326577

110 East Diamond Street, Suite 301
Butler, Pennsylvania 16001
Phone: (724) 282-6600